Lee Roy DAVIS *v.* STATE of Arkansas

CR 02-534 94 S.W.3d 892

Supreme Court of Arkansas
Opinion delivered January 9, 2003

*Katherine S. Street*, Public Defender, for appellant.

*Mark Pryor*, Att'y Gen., by: *Lauren Elizabeth Heil*, Ass't Att'y Gen., for appellee.

RAY THORNTON, Justice. Appellant, Lee Roy Davis, entered a conditional plea of guilty to the charges of possession of drug paraphernalia, a class C felony, and possession of a controlled substance with intent to deliver, a class Y felony. For these crimes, appellant was sentenced to ten years' imprisonment. On appeal, appellant challenged the trial court's denial of

his motion to suppress a crack pipe and cocaine that police officers discovered during a pat-down search as violative of his rights under the Fourth and Fourteenth Amendments and Arkansas Rules of Criminal Procedure 3.1 and 3.4. In a 3-2-1 decision, the court of appeals reversed appellant's convictions, holding that the police lacked a reasonable suspicion to believe appellant was engaged in illegal activity. *Davis v. State*, 77 Ark. App. 310, 74 S.W.3d 671 (2002) ("*Davis I*"). We granted the State's petition for review, and we affirm the trial court's denial of appellant's motion to suppress and reverse the decision of the court of appeals.

Because appellant does not raise the issue of sufficiency of the evidence, we will only provide a concise summary of the facts. Appellant and four other men stood in the yard of an abandoned house at an intersection in El Dorado known for drug activity. As two police officers, Lieutenant Billy White and Sergeant Brandon Ivy, on bicycle patrol rode past the house, they observed appellant and another man engage in an apparent hand-to-hand transaction. When appellant and the other man saw the police officers, they separated and walked away quickly. Based upon his suspicion that a transaction involving drugs might have occurred, Sergeant Ivy stopped appellant, who gave a fictitious name and birth date when asked for identification. Sergeant Ivy then relayed the information to the Arkansas Crime Information Center ("ACIC"), and the ACIC returned no record for such name and birth date.

Sergeant Ivy testified that, while it was a hot March day, appellant was sweating more profusely than was appropriate. According to the officer, appellant was fidgety, his legs were shaking, and he appeared as if he were going to run. When the officer requested appellant's consent to search, appellant asked if the officer had probable cause. Then appellant told the officer that he would "give you my sh**" as he reached for his back pocket. Sergeant Ivy grabbed his hand and told appellant that he would retrieve the item. He then pulled a crack pipe from appellant's pocket. The trial court denied appellant's motion for the suppression of this evidence.

Citing *Jefferson v. State*, 76 Ark. App. 300, 64 S.W.3d 791 (2002) and *Stewart v. State*, 332 Ark. 138, 864 S.W.2d 793 (1998), the court of appeals reversed appellant's convictions, holding that the officers did not have a reasonable suspicion to stop appellant. *Davis I, supra.* The court further rejected the State's argument that the stop was justified under the factors listed in Ark. Code Ann. § 16-81-203 (1987).

For his sole allegation of error, appellant argues that the trial court erred by denying his motion to suppress. He makes a two-pronged argument. First, he argues that his behavior did not give rise to reasonable suspicion to justify a stop under Rule 3.1 of the Arkansas Rules of Criminal Procedure. Second, he contends that even if the stop was reasonable, the officers failed to comply with Rule 3.4 of the Arkansas Rules of Criminal Procedure in con-ducting the search because they had no reason to believe that appellant was armed and dangerous. In its petition for review, the State argues that the court of appeals failed to apply the totality-of-the-circumstances test in concluding that the evidence should be suppressed.

■ Before we reach the merits of appellant's arguments, we take this opportunity to clarify our standard of review when we review a denial of a motion to suppress the evidence. Our standard of review for a trial court's action granting or denying motions to suppress evidence obtained by a warrantless search requires that we make an independent determination based upon the totality of the circumstances, giving respectful consideration to the findings of the trial judge. *State v. Osborn*, 263 Ark. 554, 566 S.W.2d 139 (1978). In *Osborn*, we stated:

> [W]e have given considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts. [*Harris v. State*, 244 Ark. 314, 425 S.W.2d 293 (1968).] We must defer to the superior position of the trial judge to pass upon the credibility of witnesses. *Whitmore v. State*, 263 Ark. 419, 565 S.W.2d 733 (1978).

*Osborn, supra.*

This standard of review is consistent with the requirements of *Ornelas v. United States*, 517 U.S. 690 (1996), where the Supreme Court stated:

> The principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."
>
> \* \* \*
>
> We therefore hold that as a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.
>
> \* \* \*
>
> In similar vein, our cases have recognized that a police officer may draw inferences based on his own experience in deciding whether probable cause exists. . . . An appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable.

*Ornelas, supra* (citations omitted). *See also United States v. Arvizu*, 534 U.S. 266 (2002).

■ The holding in *Ornelas, supra* concluded that the appellate court must: (1) identify the historical facts known to the local law enforcement officers at the time of the stop or search, and (2) determine whether those historical facts would give rise to reasonable suspicion or probable cause. While the trial court's determination of historical facts involve a "clear error" standard, the determination whether those facts would give rise to reasonable

suspicion or probable cause should give due weight to the inferences drawn from the trial judge and local police officers. This two-part inquiry requires a *de novo* review of mixed questions of law and fact. *Id.*

While this standard is consistent with *Osborn, supra*, we subsequently rephrased our standard in *Ryan v. State*, 303 Ark. 595, 798 S.W.2d 674 (1990), where we stated that "on appeal this court considers the facts in the light most favorable to the appellee." *Id.* (citing *Holden v. State*, 290 Ark. 458, 721 S.W.2d 614 (1986)). This standard did not arise out of cases involving the suppression of evidence from an allegedly unconstitutional stop, but rather stemmed from an analysis of the sufficiency of the evidence to support the verdict.

In *Dix v. State*, 290 Ark. 28, 715 S.W.2d 879 (1986), we stated:

> Our burden on appeal is to decide whether the jury's verdict is supported by substantial evidence. We view the evidence in the light most favorable to the jury's verdict.

*Id.* (citation omitted).

In a number of subsequent cases, we have stated this standard as "we view the evidence in the light most favorable to the State." Because our prior cases articulating this standard have been cases where "the light most favorable to the State" is substantially the same as a proper deference to the findings of the trial court, the use of this phrase has not resulted in any error in our prior cases. However, for clarification of our standard, we take this opportunity to express clearly the appropriate standard for review of a suppression challenge. Our standard is that we conduct a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court. *Ornelas, supra.*

Based upon this standard of review, we now proceed to the question whether the officers had a reasonable suspicion to conduct an investigative stop consistent with the Fourth Amend-

ment of the United States Constitution. The Fourth Amendment guarantees that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. 4. The protections of the Fourth Amendment extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest. *Terry v. Ohio*, 392 U.S. 1 (1968).

■ ■ Rule 3.1 of the Arkansas Rules of Criminal Procedure requires that before a law enforcement officer may detain and question an individual, he or she must have reasonable suspicion. The rule provides in pertinent part:

> A law enforcement officer lawfully present in any place may, in the performance of his duties, stop and detain any person who he reasonably suspects is committing, has committed, or is about to commit (1) a felony, or (2) a misdemeanor involving danger of forcible injury to persons or of appropriation of or damage to property, if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct.

*Id.* As we stated in *Potter v. State*, 342 Ark. 621, 20 S.W.3d 701 (2000), the key word is *suspects*. The officer is justified in making the stop if he reasonably suspects that the above crimes are being committed, have been committed, or are about to committed.

Reasonable suspicion is defined by our rules as

> a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion.

Ark. R. Crim. P. 2.1.

■ An officer must have reasonable grounds to detain a suspect under Rule 3.1 is also provided at Ark. Code Ann. § 16-81-203 (1987). The statute includes, but is not limited to, the following grounds:

(1) The demeanor of the suspect;

(2) The gait and manner of the suspect;

(3) Any knowledge the officer may have of the suspect's background or character;

(4) Whether the suspect is carrying anything, and what he is carrying;

(5) The manner in which the suspect is dressed, including bulges in clothing, when considered in light of all of the other factors;

(6) The time of the day or night the suspect is observed;

(7) Any overheard conversation of the suspect;

(8) The particular streets and areas involved,

(9) Any information received from third persons, whether they are known or unknown;

(10) Whether the suspect is consorting with others whose conduct is "reasonably suspect";

(11) The suspect's proximity to known criminal conduct;

(12) Incidence of crime in the immediate neighborhood;

(13) The suspect's apparent effort to conceal an article;

(14) Apparent effort of the suspect to avoid identification or confrontation by the police.

*Id.*

The justification for the investigative stop depends upon whether, under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating the person may be involved in criminal activity. *Hill v. State*, 275 Ark. 71, 628 S.W.2d 284 (1982). *See also Arivzu, supra* (noting that courts "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing"). Under that test, the facts articulated by the officer are not viewed in isolation, but are taken together. *Id.*

In *Davis I, supra*, the appellate court cites *Jefferson v. State*, 76 Ark. App. 300, 64 S.W.3d 791 (2002) in support of reversing the trial court. However, we reversed the court of appeals's decision on the grounds that the officers had reasonable suspicion to make

an investigatory stop in *Jefferson v. State,* 349 Ark. 236, 76 S.W.3d 850 (2002), where we stated:

> We further hold, however, that the police had a reasonable suspicion to make the stop. The totality of the circumstances, including the late hour, the area being residential, the particular area where drugs and prostitution were known problems, the incidence of crime in the area, the fact appellant had just come from between two trailers, and appellant's gait and manner, as well as an apparent effort of appellant to avoid identification or confrontation rises to a level sufficient to support the officers' suspicion that a crime had been or was about to be committed. In addition, when Jefferson began walking toward the police officers, he put his hand in his right front pocket. This act bolstered the officers' suspicion that a crime had been or was about to be committed as well as added to their concern about their safety. The decision of the trial court is affirmed.

*Id.*

Similarly, in the present case, it does not appear that the court of appeals applied a totality-of-the-circumstances test in determining whether the officers had any reasonable suspicion to stop appellant. Lieutenant White testified:

> There's a lot of drug activity in the area. This particular location is just a couple blocks away [from] what is, is commonly known as the thunder zone area, okay. But in itself in that particular intersection of Detroit and Roosevelt, you know, we have documented calls of suspicious activity or drug activity at that location.

> \* \* \*

> Next to the [vacant] house there were two particular individuals that were standing side by side as though they were exchanging something, okay. Upon seeing a bicycle patrol members [*sic*] these two subjects started to hurriedly walk away. I motioned or asked one of the individuals to stop. However, he immediately put his hand in his pocket and continued up the front porch of this house into the [vacant] residence.

While Lieutenant White attempted to approach that individual, Sergeant Ivy testified that he contacted appellant. When asked the purpose of the contact, Sergeant Ivy testified that he

decided to "just stop and detain him, identify him." The officer further testified that, while awaiting Lieutenant White's return, he asked appellant his name and birth date, but appellant gave him false information. When Sergeant Ivy called the information to the dispatcher, who ran it through ACIC, they had no information on file with that name or date of birth.

Under a totality-of-the-circumstances test, the trial court concluded that this behavior gave rise to a reasonable suspicion. Appellant and another man were in a high crime area known for drug activity. They stood in a lot beside a vacant house when the officers saw a hand-to-hand exchange. As the officers approached, the men separated and walked quickly away. At that point, appellant gave Sergeant Ivy false information when asked his name and birth date. He also appeared nervous, fidgety, and sweated profusely. Nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119 (2000). Based upon our holding in *Jefferson, supra*, as well as our rules of criminal procedure, we cannot say that the trial court erred in finding that the totality of the circumstances gave rise to a reasonable suspicion sufficient to stop and briefly detain the appellant. *See also Potter, supra* (reversing the court of appeals and holding that the officer was justified in making an investigatory stop of a man believed to be stalking a woman). Therefore, we conclude that the trial court did not err in finding that the totality of the circumstances gave rise to a reasonable suspicion sufficient to justify making an investigatory stop.

We now turn to the issue whether the officer's pat-down search was lawful. In *Terry, supra*, the United States Supreme Court upheld the lawfulness of a search based upon the need to allow an officer to search a person if the officer reasonably fears that the suspect is armed and dangerous, and such a search is necessary to protect himself and others. *Id.* The standard used to determine reasonableness in such a situation is "whether a reasonable prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

Consistent with *Terry, supra*, Arkansas Rule of Criminal Procedure 3.4 provides:

> If a law enforcement officer who has detained a person under Rule 3.1 reasonably suspects that the person is armed and presently dangerous to the officer or others, the officer . . . may search the outer clothing of such person and the immediate surroundings for, and seize, any weapon or other dangerous thing which may be used against the officer or other dangerous thing which may be used against the officers or others. In no event shall this search be more extensive than is reasonably necessary to ensure the safety of the officer or others.

*Id.*

In the present case, Sergeant Ivy testified:

> Mr. Davis kept giving indications that he was possibly fixin' to run. And I asked him to, to sit down at a, at a picnic table. Mr. Davis, he was, he was very fidgety, his, his legs were visibly, they were shaking. His, I believe it's a carotid artery in his throat, it was, it was, it was just going through his throat almost.

Then appellant reached toward his pocket, saying, "[I'll] give you my sh**" as he moved his hand toward his pocket. At that point, the officer did not know what appellant was reaching for. The officer testified:

> I said, "Do you mind if I search you?" He said, "What's your probable cause?" . . . He started to reach into his back pocket and I said, "No I'll get it." I think he said, "I'll give you my sh**." As he started reaching into his back pocket, I grabbed his hand and I said, "No, I'll get it." And then I pulled out a crack pipe. The purpose of asking him to stand up was for a pat-down search for weapons and identification. I determined to do a pat-down search at that point because there were several individuals there with well documented drugs and weapons violations. It was certain to me that he was lying or he had something to conceal or I just didn't feel comfortable with him.

This testimony reveals that the officer was concerned about the possibility of drugs and weapons violations. He had seen appellant and another man engaged in a hand-to-hand transaction, and he did not know what was in appellant's pocket. Based upon *Terry, supra,* and Rule 3.4, the pat-down search was justified under the totality of the circumstances.

 Based upon our standard of review, the officers were justified in stopping and searching appellant. Accordingly, we affirm the trial court's denial of appellant's motion to suppress the evidence, and we reverse the court of appeals' decision.

IMBER, J., not participating.

BROWN and HANNAH, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. I disagree that the police officers had a reasonable suspicion for stopping Davis in this case. For that reason, I would suppress the search.

The majority opinion describes the events leading up to the stop as follows:

> As two police officers, Lieutenant Billy White and Sergeant Brandon Ivy, on bicycle patrol rode past the house, they observed appellant and another man engage in an apparent hand-to-hand transaction. When appellant and the other man saw the police officers, they separated and walked away quickly.

I first note that after reciting the above facts, the majority later errs by adding facts to its reasonable-suspicion analysis that arose after Sergeant Ivy stopped Davis and began questioning him. Only the facts leading up to the stop may be considered for purposes of determining whether a police officer had a reasonable suspicion to warrant a stop under Ark. R. Crim. P. 3.1. *See, e.g., Florida v. J. L.*, 529 U.S. 266, 271 (2000); *Jefferson v. State*, 349 Ark. 236, 247, 76 S.W.3d 850, 856 (2002).

Next, I disagree that the facts established a "hand-to-hand transaction." Lieutenant Billy White testified that Davis and another man were "standing side by side as though they were exchanging something." Lieutenant White admitted on cross-examination that he "did not see them exchanging anything," and that he "didn't see anything actually being handed back and forth." Sergeant Brandon Ivy merely relied on what Lieutenant White told him. This rendition of events hardly qualifies as a "transaction."

Other jurisdictions have focused on the failure to observe anything actually exchanged. *See People v. Saint-Veltri*, 923 P.2d 337 (Colo. 1996), *overruled on other grounds by People v. Saint-Veltri*, 945 P.2d 1339 (1997) (holding that a police officer did not have reasonable suspicion when he observed the defendant and another man exchange an unidentified blue item and then engage in a "cupped" handshake, but did not actually see anything exchanged between the two men); *Williams v. State*, 769 So.2d 404 (Fla. Ct. App. 2000) (police officer lacked reasonable suspicion when he observed an encounter lacking any hand–to–hand transaction at an apartment complex known for drug activity); *Commonwealth v. Martinez*, 735 N.E.2d 1272 (Mass. Ct. App. 2000) (officers had reasonable cause when acting on a tip of drug sales at a specific apartment by a specific defendant and actually observed walk–up, hand–to–hand transactions taking place at that address by that defendant); *People v. Murphy*, 267 N.Y.S.2d 443 (1999) ("The hearing court properly determined that the police officer had reasonable suspicion . . . given the police officer's experience and training, the large number of drug sales in the area, and his view of a hand–to–hand transaction wherein the defendant received money for a small item.") (citations omitted).

In particular, the District of Columbia has well–developed rules on hand–gestures:

> This court has, on many occasions, evaluated the import of an exchange of money or objects between individuals in the context of an investigative stop. Generally, we have concluded that a "one–way exchange"—the passing of an object or money from one individual to another—is insufficient to justify a stop, whereas a "two–way exchange" is often "decisive" in establishing reasonable suspicion. *Compare In re T.T.C.*, 583 A.2d 986, 990 (D.C. 1990) (holding that passing a small white object in a high crime area, without further evidence of an exchange, is insufficient to support a *Terry* stop) *and Gray v. United States*, 292 A.2d 153, 156 (D.C. 1972) (holding that "the mere passing of money on a street, which the arresting officers characterized as a 'high narcotics area,'" does not give reasonable grounds to conclude that a narcotics transaction is taking place) *with Thompson v. United States*, 745 A.2d 308, 313 (D.C. 2000) (holding that the

exchange of currency for an object, along with other factors indicating drug activity, formed the basis for an articulable suspicion). *But cf. Reyes v. United States*, 758 A.2d 35, 38 (D.C. 2000) (holding that a surreptitious one-way exchange in an "open air drug market" was sufficient to justify an investigatory stop); *United States v. Bennett*, 514 A.2d 414, 416 (D.C. 1986) (holding that a one-way transfer of money, coupled with the defendant's flight and telltale signs of a drug transaction, is sufficient to create an articulable suspicion). We have reasoned that one-way exchanges have relatively little probative value because they are capable of "innumerable innocent explanations," *see Duhart*, 589 A.2d at 899, while two-way exchanges are less susceptible of multiple meanings, and at least establish a reasonable inference of a sale. *See, e.g., Thompson*, 745 A.2d at 313.

*Black v. United States*, 810 A.2d 410, 412 (D.C. 2002). Here, Officers White and Ivy saw no hand transaction at all, one-way or two-way. Accordingly, I would exclude a "hand-to-hand transaction" from the analysis.

Nor do I consider walking away quickly to be a legitimate factor in determining reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business."). *See also Meadows v. State*, 269 Ark. 380, 602 S.W.2d 636 (1980) (overturning a *Terry* stop based on the fact that the defendant quickly walked past officers and continued to look back at them). Unprovoked flight from police officers is a different matter and may factor into the reasonable suspicion analysis. *See id.* But that is not what occurred in the case before us.

What distinguishes this case from *Jefferson v. State, supra*, is that in *Jefferson*, the police officers saw the furtive actions of the defendant at night *coupled with* his putting his hand in his pocket which was perceived by the arresting officers as a threat. Here, the stop not only occurred during broad daylight but there was no threatening gesture by the defendant.

This case appears to be more closely aligned to *Stewart v. State*, 332 Ark. 138, 864 S.W.2d 793 (1998), where the stop took place largely due to the fact that the defendant was in a high crime area. Hand-to-hand contact and dispersal, without more, does not constitute reasonable suspicion in my judgment.

I respectfully dissent.

JIM HANNAH, Justice, dissenting. I must respectfully dissent. I agree that there was reasonable suspicion to support the decision to stop and detain Davis. Detective White had seen two men engage in what appeared to be a drug transaction by a hand-to-hand transfer. Davis was one of those men. This occurred in an area known for drug activity and in the front yard of an abandoned and vacant house.

However, although I agree that the stop and detention was legal, the patdown search of Davis violated Arkansas Rule of Criminal Procedure 3.4. Judge Bird's analysis in his concurrence to the court of appeals opinion is correct.

It is apparent from the trial testimony that Davis was searched because police believed he had drugs or other contraband on his person. This is prohibited under the United States Constitution, under the Arkansas Constitution, and by Ark. R. Crim. P. 3.4. Detective Ivy testified that he intended to stop and detain Davis and wait for White. Ivy testified he stopped Davis by saying: "Sir, I'm going to talk to you a minute, or something like that." Ivy testified he then told Davis he had been stopped because White had seen a hand-to-hand transaction.

Ivy testified that Davis appeared fidgety and sweaty, that his carotid artery was throbbing, and that he concluded Davis was about to flee. Because of this fear, he asked Davis to sit down at a picnic table. Ivy further testified that he asked Davis, "Do you have any weapons or drugs on you?" According to Ivy, Davis answered no, and Ivy then asked, "Do you mind if I search you?" The record is devoid of any testimony or any evidence that Ivy even had a subjective belief Davis was armed or posed a threat to his safety. There is no objective evidence, such as Ivy noting a

suspicious bulge in Davis's pocket. There is no evidence Ivy feared for his safety or had reason to fear for his safety before he commenced the search.

This court stated in *Potter v. State*, 342 Ark. 621, 30 S.W.3d 701 (2000), that under Ark. R. Crim. P. 3.4, and under *Terry v. Ohio*, 392 U.S.1 (1968), "the purpose of the protective search is wholly for the safety of the officer or others." *Potter*, 342 Ark. at 630. This court in *Potter, supra*, further stated that "police officers are not permitted to search for drugs under the guise of a search for weapons." *Potter*, 342 Ark. at 630 (citing *Minnesota v. Dickerson*, 508 U.S. 366 (1993)). Just six months ago, this court stated that a search is unlawful where the officer is seeking narcotics in searching rather than searching out of fear for his own safety. *Jefferson v. State*, 349 Ark. 236, 76 S.W.3d 850 (2002). This is obviously so because only a "protective search" is lawful under these conditions. *Potter, supra*.

The majority's decision cannot be squared with prior case law. In *Shaver v. State*, 332 Ark. 13, 963 S.W.2d 598 (1998), this court stated:

> We have also held that, after a lawful stop, the police are permitted to search the outer clothing of an individual and the immediate vicinity for weapons if the facts available to an officer would warrant a person of reasonable caution to believe that a limited search was appropriate. *State v. Barter*, 310 Ark. 94, 833 S.W.2d 372 (1992); *Stout v. State*, 304 Ark. 610, 804 S.W.2d 686 (1991); A. R. Cr. P. Rule 3.4. Stated in slightly different terms, when an officer is justified in believing that an individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officers or others, a patdown search may be conducted to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. *Terry v. Ohio*, 395 U.S. 1 (1968).

*Shaver*, 332 Ark. at 15.

Ivy testified that he asked Davis if he had a weapon on him, and that when he asked Davis to stand to carry out the patdown,

he did so "for weapons, identification." However, there is no evidence of any facts that would justify a belief that Davis was armed.

The majority bases its conclusion the search was legal because the officer initiated the patdown search when Davis reached in his pocket. The majority states: "Then the appellant reached toward his pocket saying, '[I'll] give you my sh##' as he moved his hand toward his pocket. At that point, the officer did not know what appellant was reaching for." It is not at all clear that these facts would support a reasonable belief that Davis was armed, however, one need not even reach that analysis because these events cited by the majority all occurred after Ivy asked to search Davis and instructed Davis to stand so he could carry out the search. Ivy had initiated the search before Davis reached for his pocket. The evidence shows Ivy had already decided to search Davis before he stood up. The success of the search will not validate the search if it was unlawful in its inception. *Willett v. State*, 298 Ark. 588, 769 S.W.2d 744 (1989); *Walton v. State*, 245 Ark. 84, 431 S.W.2d 462 (1968).

Ivy testified that he "searched Mr. Davis because he kept giving indications he was possibly fixing to run." The search was not a protective search. Ivy asked Davis: "Do you mind if I search you?" Davis challenged Ivy's probable cause, and Ivy commanded Davis to stand up. At that point, Davis said, "You don't have to go through that shit," and reached toward his back pocket. Ivy grabbed Davis's hand and reached into Davis's pocket. All this occurred after Ivy stated his intent to search, so it is apparent that the reason for the search was to find contraband, not because of officer safety. In *Jefferson*, a weapon was drawn and the decision to search appellant was made after the appellant slipped his hand in his pocket. In this case, Davis was simply searched for contraband. Nonetheless, contrary to the clearly stated law as set out by this court and the United States Supreme Court, the majority now permits a search for drugs under the guise of a search for weapons.

The conclusion that a patdown was proper is without foundation. This case should be reversed based on an unlawful search.